UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JEFFREY HERMANN,<br><br>        *Plaintiff.*<br><br>  vs.<br><br>UNILY, INC. f/k/a BRIGHTSTARR<br>US INC.,<br><br>        *Defendant.* | 25-cv-4431<br><br><br>**COMPLAINT** |

Plaintiff Jeffrey Hermann, by his undersigned counsel, for his Complaint against Defendant Unily, Inc. f/k/a Brightstarr US Inc. ("Unily," "Defendant," or the "Company"), alleges as follows:

## Introduction

1.      This is a case about a company that punished an employee for surviving.

2.      While Plaintiff Jeffrey Hermann was undergoing open-heart surgery following a heart attack, Unily permanently stripped him of his entire $5 million sales pipeline and reassigned all of his accounts to other sales representatives.

3.      When he returned from protected medical leave, Plaintiff learned that the Company had taken away his entire pipeline while he was recovering from

surgery—leaving him with $0 in sales opportunities—and that his sales quota was being nearly doubled.

4.      The removal of Plaintiff's pipeline during his medical leave, the imposition of unattainable quotas, the issuance of demonstrably inaccurate PIPs, and his termination for challenging those inaccuracies were not isolated missteps. Rather, they were part of an ongoing unlawful employment practice rooted in Unily's discriminatory policy of treating medical leave as a forfeiture of pipeline, falsifying sales cycle metrics, and placing returning employees in no-win situations that inevitably led to termination.

5.      Plaintiff brings claims of disability discrimination and retaliation in violation of the Americans with Disabilities Act, as amended, 42 U.S.C. §§ 12101, et seq. ("ADA"), to redress these wrongs.


**Jurisdiction and Venue**

6.      Pursuant to 28 U.S.C. §§ 1331 and 1343, this Court has subject matter jurisdiction over this action because it involves federal questions regarding the deprivation of Plaintiff's rights under the Americans with Disabilities Act, as amended, 42 U.S.C. §§ 12101, et seq. ("ADA").

7.      Pursuant to 28 U.S.C. § 1391(b)(2), venue is proper because a substantial part of the events or omissions giving rise to this action occurred in this District.

## Administrative Prerequisites

8.      On or around April 6, 2024, Plaintiff filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") alleging claims under the ADA. Upon information and belief, following consultation with the EEOC regarding the location of the New York-based office to which Plaintiff reported, the Charge was also dual-filed with the New York State Division of Human Rights.

9.      On February 26, 2025, Plaintiff received a Notice of Right to Sue from the EEOC.

10.     Fewer than 90 days have passed since Plaintiff received his Notice of Right to Sue.

11.     Any and all other prerequisites to the filing of this action have been met.

## Parties

12.     Plaintiff Jeffrey Hermann is currently a resident of the State of Florida.

13.    Plaintiff was employed by Unily from February 14, 2022 through June 16, 2023.

14.    At all relevant times, Plaintiff was an "employee" of Defendant within the meaning of all relevant statutes and applicable regulations thereunder.

15.    Defendant Unily, Inc. f/k/a BrightStarr US Inc. is a foreign corporation with its principal place of business located at 31 Bond Street, New York, NY 10012.

16.    At all material times, Unily is and was an employer with 15 or more employees who are and were engaged in interstate commerce and that employs and has employed 15 or more individuals for at least 20 weeks in the current and preceding calendar years.

17.    At all relevant times, Unily established, implemented, disseminated, and controlled all of employment policies applicable to Plaintiff.

18.    At all relevant times, Unily controlled and directed the terms and conditions of Plaintiff's employment.

19.    At all relevant times, Unily maintained and exercised the power to hire, fire, discipline, and promote Plaintiff.

20.    At all relevant times, Unily was an "employer" within the meaning of all relevant statutes and applicable regulations thereunder.

21.    At all relevant times, the acts and omissions of Unily's officers, employees, and agents described herein were within the scope of their authority and are attributable to Unily.

## FACTS

22.    Plaintiff Jeffrey Hermann is a seasoned enterprise sales executive who was hired by Unily, Inc. ("Unily" or "Defendant") on February 14, 2022, as a Senior Enterprise Account Executive assigned to manage the North American manufacturing vertical. Plaintiff was selected for this role based on his prior success selling to large manufacturing clients, having previously closed strategic deals with large companies.

**A.    Plaintiff's Strong Performance and Demonstrated Success at Unily**

23.    Plaintiff was successful in his role at Unily, leveraging his deep experience in technology sales to deliver strong results early in his tenure. Within a few months, he was entrusted with a second vertical—Hospitality—in addition to his original assignment in the Manufacturing vertical. In 2022, Plaintiff played a

key role in closing a major deal with Lucid Motors, which had previously been deemed nonviable by the client's CEO but was successfully revived and closed through Plaintiff's renewed efforts.

24.    Had Plaintiff received the agreed-upon 50/50 credit for a Honeywell deal that closed while he was on medical leave—a deal that had been listed under his name in Salesforce prior to his leave—he would have met or exceeded his 2022 quota of $742,000. Unily chose not to pay Plaintiff for the Honeywell deal, or any portion thereof, because Plaintiff was on medical leave at the time the deal closed.

25.    By the time he suffered a heart attack on October 6, 2022, requiring an emergency angioplasty and open-heart surgery, Plaintiff had independently built a qualified sales pipeline exceeding $5 million—more than seven times his 2022 annual sales quota.


**B.    Plaintiff's Heart Attack and Open-Heart Surgery**

26.    On October 6, 2022, Plaintiff suffered a serious heart attack that required immediate emergency intervention in the form of an angioplasty to address life-threatening arterial blockages. The following day, Plaintiff underwent open-heart surgery—a triple coronary artery bypass—to correct multiple severe blockages and help provide long-term cardiovascular stability.

27.    Plaintiff remained on medical leave from October 6, 2022, through

January 6, 2023, to recover from this life-altering medical event.

**C.    Plaintiff Continued to Have Conditions that Constitute Disabilities Even After Returning to Work**

28.    Plaintiff returned to work full-time at Unily on January 6, 2023,

following a three-month medical leave necessitated by a heart attack and

subsequent open-heart surgery. Although he was formally cleared to return to

work, he continued to experience a number of physical and psychological

symptoms that were directly related to his cardiac event and recovery. These

included, without limitation, heart disease, chest discomfort due to the sternotomy,

shortness of breath, limited physical stamina, periodic dizziness, difficulty

sleeping, and chronic anxiety.

29.    Plaintiff was advised not to lift more than ten pounds during this time

unless and until he felt comfortable doing so, due to the time required for full

healing of the sternum. He also experienced numbness and discomfort in his leg—

where arteries had been harvested for the bypass surgery—making travel and

certain physical tasks difficult. These symptoms affected Plaintiff's ability to lift,

sleep, and perform manual tasks, and were expected to persist for six to twelve

months.

30.     In addition to these physical limitations, Plaintiff began experiencing significant mental health symptoms as a result of the trauma of his near-death experience. He was diagnosed with anxiety and depression and was under the care of both a psychiatrist and a therapist throughout 2023. These mental health conditions—exacerbated by the stress of returning to a hostile work environment—substantially limited Plaintiff's ability to sleep, concentrate, and manage day-to-day stress.

31.     Plaintiff's ongoing shortness of breath, chest discomfort, limited physical stamina, dizziness, and clinically diagnosed anxiety and depression each constituted impairments that substantially limited one or more major life activities, including sleeping, concentrating, breathing, lifting, and working—particularly in a high-stress environment. These impairments also affected major bodily functions, including Plaintiff's respiratory, circulatory, neurological, and brain functions. Accordingly, Plaintiff had one or more physical and mental impairments that qualified as disabilities under the Americans with Disabilities Act.

**D.     Unily Was Aware That Plaintiff Had Conditions That Constitute Disabilities Even After Returning to Work**

32.     Unily was aware that Plaintiff continued to experience conditions that constituted disabilities after his return to work in January 2023. Before returning,

Plaintiff informed Unily's Human Resources representative, Alexa Perlstein, that he had a lifting restriction not to exceed ten pounds unless and until he felt physically able to lift more. This restriction was consistent with his post-surgical recovery plan and the expected healing time for his sternum, which medical professionals advised could take six to twelve months.

33.    After returning to work, Plaintiff communicated periodically with his manager, Neil Miklusak, about his ongoing recovery from his heart attack and open-heart surgery, repeatedly describing himself as still "recovering." Plaintiff also shared with him information about his health conditions and challenges, such as that he had diabetes, and on or about April 3, 2023 informed Miklusak that he continued to experience chest discomfort from the sternotomy, shortness of breath, disrupted sleep due to severe acid reflux, periodic dizziness, and lingering pain and numbness in his leg where arteries had been harvested for the bypass procedure. He explained that while his heart was doing well, he was still dealing with secondary symptoms resulting from the trauma of the procedure and its after-effects.

34.    Plaintiff also advised Miklusak on or about April 3, 2023, in words or substance, that over the prior six weeks he was in a perpetual state of anxiety panic attack, and disclosed that he had been prescribed Xanax to manage this ongoing condition.

9

35.    These communications, among others, provided Unily with notice that Plaintiff continued to experience both physical and psychological impairments that substantially limited major life activities and bodily functions. Accordingly, Unily was made aware that Plaintiff had conditions that constituted disabilities under the Americans with Disabilities Act.

**E.    Unily's Discriminatory Practice of Treating Medical Leave as a Pipeline Forfeiture to Falsify Sales Cycle Metrics, and Place Sales Employees Who Took Medical Leave in a No-Win Situation**

36.    While Plaintiff was undergoing open-heart surgery, Unily permanently removed his entire $5 million pipeline of sales opportunities, falsely labeling them as "Lost to Competitor" in its Salesforce system, and reassigning the underlying accounts to other sales representatives. These opportunities—across both the Manufacturing and Hospitality verticals—were not lost at all: they were simply erased from Plaintiff's name and reopened under new representatives, resetting the sales timeline and stripping Plaintiff of credit, commission eligibility, and the ability to meet his sales quotas.

37.    In addition to removing Plaintiff's pipeline, Unily also permanently reassigned the entire Hospitality vertical to other sales representatives during Plaintiff's medical leave. This reassignment was not temporary coverage, but a full

revocation of a vertical that had been entrusted to Plaintiff based on his prior success and expanding role at the Company. Upon returning from leave, Plaintiff was not reinstated to this vertical, nor was he given a comparable portfolio—further depriving him of the opportunity to succeed and reinforcing the Company's practice of using medical leave as a disqualifier for sales opportunities and vertical assignments.

38.    In effect, Unily used Plaintiff's protected medical leave as an opportunity to erase—and then reassign to non-disabled colleagues—all of the sales opportunities he had cultivated. This misrepresented the status of those deals, denied Plaintiff the ability to receive any credit or commissions, and left him in an impossible position: returning from major surgery with a $0 pipeline and a 2023 quota that was nearly double his 2022 quota.

39.    This practice occurred against a backdrop of rampant turnover in Unily's sales leadership. When Plaintiff returned in January 2023, he was reporting to his fourth manager in less than a year. The rapid succession of sales managers—averaging one every 90 days—meant there was no meaningful knowledge transfer or continuity regarding Plaintiff's pipeline. In that vacuum, and under pressure to demonstrate shorter deal cycles to impress the majority shareholder and potential investors, Unily allowed incoming managers to treat medical leaves like Plaintiff's

as a proxy for failed deals—closing them out and restarting the sales clock to improve the performance metrics of Miklusak and his team.

40.    The result was twofold: first, Unily artificially shortened its reported deal cycle lengths—an important sales efficiency metric—making it appear that deals were closing more quickly than they actually were. Second, it allowed new managers to take credit for deals they had not developed, inflating their performance records. For Plaintiff, the impact would be devastating: he would return from major surgery to a $0 pipeline, no support, no adjustment to his quota, and no path to success—despite Unily's own acknowledgment that its typical sales cycle ranged from 9 to 15 months, averaging about 12 months.

**F.    Unily's Discriminatory Treatment of Plaintiff Upon Return from Medical Leave**

41.    Upon returning from protected medical leave on January 6, 2023, Plaintiff was assigned to a new manager, Neil Miklusak, who had not overseen Plaintiff prior to his leave. Despite being fully aware of Plaintiff's recent open-heart surgery and the circumstances of his medical leave, Miklusak imposed an increased sales quota of $1.2 million for 2023—up from $742,500 in 2022—*even though Unily had permanently taken away the $5 million pipeline Plaintiff had developed prior to his leave, leaving him with nothing.* Although Plaintiff could

have worked successfully with an even higher quota (e.g., $1.6 million) if his entire pipeline had not been taken away, Plaintiff returned from open heart surgery with a quota that had nearly doubled and a pipeline artificially reduced to zero, rendering the 2023 sales target objectively unattainable.

42.    Miklusak confirmed that the pipeline Plaintiff had cultivated prior to his leave had been permanently reassigned to other sales representatives, none of whom were required to share quota credit. Plaintiff was not credited for any portion of those reassigned deals and was given no new opportunities. He was expected to achieve $240,000 in sales within the first 75 days of his return—despite Unily's average sales cycle ranging from 9 to 15 months.

43.    Plaintiff had invested extensive time and effort developing relationships and technical expertise within the manufacturing vertical, positioning him as the most qualified person to resume work on the deals he had cultivated prior to his medical leave. Many of these opportunities were already well into the sales cycle and required continuity and subject-matter familiarity to close.

44.    By making the reassignment of those manufacturing accounts permanent—rather than temporary—Unily not only disregarded Plaintiff's unique qualifications and historical investment, but also deviated from its own vertical specialization model. This departure from established practice would not have occurred but for Unily's discriminatory policy of treating medical leave as a

13

pipeline forfeiture, in order to falsify sales cycle metrics and place returning employees in no-win situations.

45.    Meanwhile, other sales representatives retained their existing pipelines and were not subjected to increased quotas.

46.    A substantial portion of Plaintiff's total compensation—approximately half—was commission-based. By permanently reassigning his pipeline, denying him credit for the deals he had cultivated, and imposing a quota that was impossible to meet under the circumstances, Unily deprived Plaintiff of the opportunity to earn the commissions that formed a significant part of his compensation.

47.    When Plaintiff objected to these conditions and raised concerns about being treated differently and placed at a serious disadvantage due to his medical leave, Miklusak refused to make any adjustments and did not refer the matter to Human Resources or senior leadership. These decisions—especially given the complete elimination of Plaintiff's pipeline and the nearly doubled quota while leaving him with a pipeline of $0—left Plaintiff in a structurally impossible position.

48.    Unily's treatment of Plaintiff was not merely unfair—it exemplified intentionally discriminatory treatment under the ADA. On several occasions from January through May 2023, Plaintiff repeatedly objected to the Company's

manipulation of sales data, the permanent reassignment of his pipeline during protected leave, and the imposition of a quota that was mathematically unattainable. He specifically pointed out that these practices placed him at a severe disadvantage compared to colleagues who had not taken medical leave. His manager, Neil Miklusak, dismissed these concerns, stating in words or substance that this was standard procedure.

**G.    Escalating Discriminatory Conduct Between March 1 and the Issuance of the Demonstrably Baseless PIP**

49.    On March 1, 2023, Plaintiff participated in a one-on-one meeting with his manager, Neil Miklusak. During that meeting, Miklusak directed Plaintiff to begin contacting top prospects in the manufacturing vertical by March 6 and to identify two to three sales opportunities totaling approximately $400,000 to $500,000 in pipeline by the end of Q2. These modest targets reflected Miklusak's own understanding of Unily's extended sales cycle and Plaintiff's recent return from medical leave.

50.    Within less than three months of that meeting, Plaintiff had generated over $3 million in qualified pipeline—more than six (6) times the target Miklusak had set.

51.    Yet despite Plaintiff's progress, Miklusak failed to provide the managerial support necessary to advance these opportunities. He ignored requests for strategic guidance, failed to respond to time-sensitive messages, and gradually disengaged from one-on-one meetings and customer interactions. This lack of support was not incidental: Miklusak had effectively written Plaintiff off, imposing unattainable goals and halving his earning potential, because he viewed Plaintiff—following open-heart surgery and an extended medical leave—as someone who was no longer viable or worth investing in.

52.    In late March or early April 2023, Plaintiff requested a minor accommodation related to travel for an upcoming New York City sales meeting. Specifically, he asked to delay his flight by half a day to reduce the physical and emotional strain of travel—explaining to Miklusak in writing that he was hesitant to travel, had a strict recovery regimen, and had not slept outside his apartment since returning from open-heart surgery. Days later, during a follow-up call, Plaintiff disclosed to Miklusak that his doctors had advised against travel due to ongoing recovery-related complications, including respiratory issues, acid reflux episodes that interrupted his sleep, and persistent anxiety. He also shared that he had been experiencing a "perpetual state of like anxiety panic attack" for the past six weeks.

16

53.     Despite these disclosures, Miklusak neither approved the modest request nor engaged in any interactive discussion. Instead, he failed to respond at all. Faced with silence and increasing strain in the relationship, Plaintiff reluctantly decided to travel on the original schedule, forgoing the requested accommodation to avoid retaliation. Notably, other sales representatives without disabilities were allowed to skip the meeting or modify their travel without incident—underscoring the disparate treatment Plaintiff experienced.

54.     Plaintiff continued to raise legitimate concerns about the unreasonable sales quotas and lack of support, but was met with hostility. In April 2023, when Plaintiff again objected to these conditions and raised concerns about being treated differently and placed at a serious disadvantage due to his medical leave, Miklusak mocked his medical condition, asking whether he could not keep up due to his condition, and threatened to lower Plaintiff's salary if he failed to meet his unattainable quota.

55.     Around this time, Miklusak also directed Plaintiff to shift his focus away from 2023 sales activity and instead prioritize long-term planning for the manufacturing vertical in 2024 and 2025. This instruction was particularly damaging given that Plaintiff had been stripped of his existing 2023 pipeline and left with no viable short-term opportunities. By diverting Plaintiff's attention from immediate revenue generation, Miklusak ensured that Plaintiff would fall ever

17

farther short of his already-impossible 2023 sales targets—thus laying the groundwork to justify a formal Performance Improvement Plan and, ultimately, Plaintiff's termination. This directive was not an innocent reallocation of priorities; it was part of a broader pattern of setting Plaintiff up to fail under the guise of strategic planning.

## H.    Miklusak Stereotypes and Threatens Plaintiff During a Late-May 2023 Meeting

56.    In or around late May 2023, just weeks before Plaintiff's termination, Plaintiff met with his manager, Neil Miklusak, for what became a contentious conversation about Plaintiff's performance and the Company's expectations. During that meeting, Miklusak informed Plaintiff that he would be placed on a formal Performance Improvement Plan (PIP) and warned that his employment would be terminated if, within six (6) weeks, it did not appear that Plaintiff was meeting the Company's performance targets and expectations.

57.    In response to this announcement, Plaintiff voiced strong objections, reiterating that the Company's actions were unfair and appeared to be motivated by discriminatory intent. He explained that he had returned to work after major open-heart surgery only to discover that his entire sales pipeline had been stripped away—leaving him with no realistic path to meet an elevated sales quota. He

emphasized that this treatment was fundamentally unjust given the Company's

knowledge of his medical leave and the acknowledged 9–15-month sales cycle for

enterprise deals.

58.    Notably, none of Plaintiff's peers—other enterprise account

executives who held the same title and responsibilities—were subjected to the

same draconian quota demands in the absence of a functioning pipeline. These

colleagues were similarly situated in all material respects apart from Plaintiff's

protected medical condition and recent leave of absence. The Company's decision

to impose an unattainable sales quota on Plaintiff, while leaving others

unencumbered by such obstacles, underscores the discriminatory nature of its

actions.

59.    Plaintiff further noted that, even under these conditions, he had rebuilt

millions in qualified pipeline within a few months, progress that should have been

commended rather than penalized. He stated plainly that he believed he was being

targeted for adverse treatment because of his medical condition and his use of

protected leave.

60.    Rather than engage with these concerns in good faith, Miklusak

ignored the salient points raised by Plaintiff and stereotyped him as someone who

lacked effort and commitment. Miklusak's perception of Plaintiff as the older sales

guy with medical issues—returning from open-heart surgery and managing chronic

conditions like diabetes—contributed to his view that Plaintiff was less valuable and more dispensable than his younger, non-disabled peers.

61.    The tone and substance of the meeting made clear that the PIP was not designed to genuinely support Plaintiff's performance but rather to lay the groundwork for his termination. Coming after months of discriminatory treatment—including the removal of Plaintiff's pipeline, the imposition of an unattainable quota, and repeated dismissals of his complaints about disparate treatment—the PIP served as a pretext to push Plaintiff out under the guise of performance management.

## I.    Plaintiff Escalates His Complaints of Discrimination to Human Resources

62.    Immediately following the late-May 2023 meeting with Neil Miklusak—during which Miklusak disclosed plans to place Plaintiff on a formal Performance Improvement Plan (PIP)—Plaintiff contacted Unily's Human Resources department to report what he believed was discriminatory treatment. Plaintiff spoke with Alexa Perlstein and conveyed, in substance, that he had just come out of a contentious meeting with Miklusak, during which he was told he would be placed on a PIP despite having returned only months earlier from medical leave for open-heart surgery.

63.     During that call, Plaintiff explicitly stated that he felt he was being treated unfairly and differently from other people because of his heart attack, disability, and use of protected medical leave. Plaintiff also told Ms. Perlstein that he believed Miklusak wanted to get rid of him because of his disability, and that the PIP was part of an effort to push him out under false pretenses. Plaintiff made clear that the treatment he was receiving was not only inconsistent with how other sales representatives were managed, but was also deeply unjust given the circumstances of his return from major surgery.

64.     Ms. Perlstein assured Plaintiff that she would look into his complaints.

65.     However, upon information and belief, no investigation was ever conducted, and no corrective action was taken. Instead, the Company continued its course of conduct, culminating in Plaintiff's termination shortly thereafter.

## J.     Unily's Failure to Adhere to Its Own Anti-Discrimination Policies

66.     Unily's Employee Handbook outlines specific obligations concerning disability accommodations and the handling of employee complaints. Sections 1.4 and 1.5 mandate that the company provides reasonable accommodations to employees with disabilities and engages in an interactive process to identify such accommodations. Sections 4.1 and 4.5 require that all complaints of discrimination

or harassment be investigated promptly and thoroughly. Unily failed to comply with these procedures in Plaintiff's case.

**K.    Plaintiff's Termination:  The Culmination of Unily's Discriminatory Practice of Treating Medical Leave as a Pipeline Forfeiture to Falsify Sales Cycle Metrics, and Place Sales Employees Who Took Medical Leave in a No-Win Situation**

67.    On or about June 1, 2023, Unily issued a demonstrably baseless Performance Improvement Plan (PIP) containing numerous inaccuracies and misrepresentations that painted a false picture of Plaintiff's performance.

68.    Plaintiff promptly identified the inaccuracies within the PIP, referencing data from the Company's Salesforce system that contradicted the PIP's assertions. Despite presenting this evidence, Plaintiff's manager, Neil Miklusak, refused to make the necessary corrections.

69.    Over the subsequent days, Miklusak issued several revised versions of the PIP, each still containing significant misstatements. Plaintiff continued to highlight these discrepancies, providing concrete evidence from the Company's own records. The inaccuracies went uncorrected.

70.    On June 12, 2023, approximately four days before his termination, Plaintiff participated in a call with Unily's in-house counsel, Ben Oakley, and

Miklusak. During this call, Plaintiff questioned the rationale behind the Company's refusal to correct the demonstrably false information in the PIP. He emphasized that the challenges he faced seemed to stem from his recent return from disability leave, and expressed his desire to be judged fairly and accurately.

71.    On June 16, 2023, Unily, acting through Alexa Perlstein, its HR representative, and Ben Oakley, Esq., its General Counsel, had a call with Plaintiff in which they chastised Plaintiff for submitting a corrected version of the PIP.

72.    During the call, Plaintiff emphasized that the PIP that Miklusak issued contained information that was demonstrably inaccurate. In response, Oakley replied, in words or substance, that Miklusak was interpreting the data in a way different from how Plaintiff was interpreting it, and that Unily would defer to Miklusak's interpretation of the data.

73.    After Plaintiff stated in words or substance that he only had three losses, not the vastly higher number listed in the PIP, Perlstein replied, in words or substance, that she too would have to defer to Miklusak's interpretation of the data because she did not know enough about the subject to determine whether Miklusak's interpretation of Plaintiff's win-loss rate was correct or not.

74.    Perlstein claimed in words or substance that Plaintiff had been accommodated for his medical condition by having his sales quota adjusted.

75.    Plaintiff disputed this, and expressed again that he was being discriminated against for having been out on medical leave and undergoing open-heart surgery. He continued to press for fair treatment and for the inaccuracies in the PIP to be addressed.

76.    Subsequently, Oakley and Perlstein informed Plaintiff that he was being terminated effective immediately for his alleged failure to engage.

77.    The removal of Plaintiff's pipeline and verticals during his protected medical leave, the imposition of unattainable quotas, the refusal to accommodate his ongoing disabilities, the issuance of demonstrably inaccurate PIPs, and his termination for challenging those inaccuracies were not isolated incidents. Rather, they were part of an ongoing unlawful employment practice tied to Unily's discriminatory policy and practice of treating medical leave as a pipeline forfeiture, falsifying sales cycle metrics, and placing returning employees in no-win scenarios.

## **First Cause Of Action**

## **Disability Discrimination in Violation of the ADA**

78.     Plaintiff incorporates this pleading's preceding claims by reference.

79.     During the full period, Plaintiff was protected by, and Defendant subject to, the ADA's provisions and all applicable regulations thereunder.

80.     At all relevant times, Plaintiff was an individual with a disability as defined under the Americans with Disabilities Act, 42 U.S.C. § 12102(1).

81.     Specifically, Plaintiff had actual physical and mental impairments—including but not limited to cardiovascular disease requiring open-heart surgery, diabetes, and clinically diagnosed anxiety and depression—that substantially limited one or more major life activities and bodily functions, including but not limited to breathing, sleeping, lifting, concentrating, neurological and brain functions, circulatory functions, and working in a high-stress environment.

82.     Plaintiff also had a record of such impairments, having undergone emergency cardiac surgery and received medical leave for recovery, together with follow-up medical care. These impairments were known to Defendant through Plaintiff's disclosures and medical leave documentation.

25

83.     In addition, Defendant regarded Plaintiff as having a disability within the meaning of 42 U.S.C. § 12102(1)(C). During Plaintiff's employment, Miklusak openly questioned whether Plaintiff's "condition" prevented him from meeting performance expectations, mocking his alleged inability to keep up post-surgery. Similarly, HR director Perlstein claimed that the Company had already provided Plaintiff with reasonable accommodations—effectively acknowledging the Company's perception that Plaintiff had a disabling condition requiring accommodation. These and other statements, combined with the Company's actions, demonstrate that Plaintiff was subjected to adverse treatment based on actual or perceived physical or mental impairments, regardless of whether those impairments substantially limited a major life activity.

84.     Defendant's discriminatory conduct as aforesaid also deprived Plaintiff of the ability to "enjoy equal benefits and privileges of employment as are enjoyed by ... other similarly situated employees without disabilities." 29 C.F.R. § 1630.2(o)(1)(iii).

85.     Plaintiff's employment would not have been terminated on June 16, 2023 but for his disabling health conditions as aforesaid and the medical sequalae relating thereto.

86.    Defendant's conduct as aforesaid constituted unlawful disability discrimination under the ADA, and was not based on any legitimate, nondiscriminatory business necessity.

87.    As a direct and proximate result of Defendant's unlawful actions, Plaintiff has suffered, and continues to suffer, damages including but not limited to lost income, physical, emotional, and nonpecuniary harm, and attorney's fees and costs.

88.    Defendant's discriminatory conduct was undertaken with malice and/or with reckless indifference to Plaintiff's federally protected rights under the Americans with Disabilities Act. As such, punitive damages should be imposed against Defendant under 42 U.S.C. § 1981a(b)(1).

## Second Cause Of Action

## Retaliation in Violation of the ADA

89.    Plaintiff incorporates this pleading's preceding claims by reference.

90.    The Americans with Disabilities Act prohibits an employer from retaliating against an employee for engaging in protected activity, including opposing discriminatory practices, requesting reasonable accommodations, or filing complaints of disability discrimination.

27

91.     Plaintiff engaged in multiple protected activities under the ADA as aforesaid, including but not limited to: (a) objecting to the stripping of his pipeline and imposition of an unattainable quota because of his medical leave; (b) repeatedly complaining to Miklusak that he was being treated unfairly and differently than non-disabled employees; (c) reporting actual and perceived disability discrimination to Human Resources and Unily's in-house counsel; and (d) refusing to sign demonstrably baseless and inaccurate PIP documents that mischaracterized his performance in the wake of his protected complaints.

92.     Defendant was aware of Plaintiff's protected activity. Plaintiff made multiple internal complaints to his manager Neil Miklusak, to Human Resources representative Alexa Perlstein, and to General Counsel Ben Oakley, all of which constituted complaints that he was being treated unfairly and differently than non-disabled employees, and opposing the Company's ongoing course of disparate treatment in that regard.

93.     These complaints were met with ever-worsening treatment from Unily, culminating in Plaintiff's termination shortly after Plaintiff continued protesting the discriminatory and baseless nature of the various iterations of the PIP that was being issued against him, culminating in Plaintiff's retaliatory termination.

28

94.     The close temporal proximity between Plaintiff's protected complaints and protected oppositional conduct, on the one hand, and Unily's worsening treatment of Plaintiff, on the other, support a rational inference of retaliatory motive, particularly when viewed in conjunction with Defendant's affirmatively discriminatory conduct, Defendant's disregard for objective performance data, and Defendant's refusal to correct demonstrable inaccuracies in the PIP.

95.     Defendant's proffered reasons for terminating Plaintiff are pretextual and were advanced to mask unlawful retaliation for Plaintiff's protected activities under the ADA.

96.     As a direct and proximate result of Defendant's retaliatory conduct, Plaintiff has suffered, and continues to suffer, damages including but not limited to lost income, physical, emotional, and nonpecuniary harm, and attorney's fees and costs.

97.     Defendant's retaliatory conduct was undertaken with malice and/or with reckless indifference to Plaintiff's federally protected rights under the Americans with Disabilities Act. As such, punitive damages should be imposed against Defendant under 42 U.S.C. § 1981a(b)(1).

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendant, and grant the following relief:

A.    A declaratory judgment that Defendant's conduct violated the Americans with Disabilities Act;

B.    An award of back pay, including lost wages, benefits, and other compensation, with interest;

C.    Front pay in lieu of reinstatement, or reinstatement if that is deemed suitable under the circumstances and found to be more appropriate than front pay;

D.    Damages, including compensatory and nonpecuniary damages, for physical, emotional, and reputational harm, suffering, inconvenience, mental anguish, and diminished enjoyment of life;

E.    Punitive damages for Defendant's malicious and reckless conduct;

F.    Pre-judgment and post-judgment interest as permitted by law;

G.    An award of reasonable attorneys' fees, expert fees, costs, disbursements, and an offset for the negative tax consequences of receiving a lump sum payment for lost wages and benefits; and

H.    Such other and further relief as the Court deems just and proper.

JURY TRIAL DEMAND: Plaintiff demands a trial by jury on all issues so triable.


Dated:        May 27, 2025              Respectfully submitted,

                                        Law Offices of Scott A. Lucas
                                        600 Mamaroneck Avenue, Suite 400
                                        Harrison, NY 10528
                                        Direct: (646) 342-1139
                                        Office: (646) 632-3737
                                        scott@lucasemploymentlaw.com
                                        *Attorneys for Plaintiff Jeffrey Hermann*

                                        By: */S/ Scott A. Lucas*
                                            Scott A. Lucas

30